The PEOPLE of the State of Colorado, Complainant

v.

Christopher Paul FORSYTH, Respondent.

No. 12PDJ016.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Dec. 17, 2012.

On October 2 and 3, 2012, a Hearing Board composed of WILLIAM H. LEVIS and REGINA M. RODRIGUEZ, members of the bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("the PDJ"), held a hearing pursuant to C.R.C.P. 251.18. Adam J. Espinosa appeared for the Office of Attorney Regulation Counsel ("the People"), and Gary S. Cohen appeared on behalf of Christopher Paul Forsyth ("Respondent"). The Hearing Board now issues this "Opinion and Decision Dismissing Complaint Pursuant to C.R.C.P. 251.19(b)."

## OPINION AND DECISION DISMISSING COMPLAINT PURSUANT TO C.R.C.P. 251.19(b)

### I. SUMMARY

The People claim that Respondent engaged in frivolous litigation and prejudiced the administration of justice in violation of Colo. RPC 3.1 and 8.4(d) by filing an appeal that the Colorado Court of Appeals deemed to be without merit. The Hearing Board concludes that the People have not proved misconduct by clear and convincing evidence, and we therefore dismiss their complaint.

### II. PROCEDURAL HISTORY

The People filed their complaint in this matter on February 14, 2012. Through counsel, Respondent filed an answer on March 5, 2012.[1] A one-day hearing was originally scheduled in this case for July 31, 2012. The PDJ subsequently granted Respondent's motion to continue the trial, and the PDJ reset the matter as a two-day hearing.

During the hearing, the Hearing Board heard testimony from Respondent, Troy Rackham, Peter Forbes, Doug Thomas, and Carmen Decker and considered the stipulated facts, stipulated exhibits 1–7, the People's exhibits 13–14 and 20, and Respondent's exhibit A.[2]

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on May 13, 1993, under attorney registration number 22608.[3] He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in these disciplinary proceedings.[4]

### Representation of May McCormick

This disciplinary matter arises out of Respondent's representation of May McCormick ("McCormick"). Respondent, who primarily practices in the area of worker's compensation, has represented McCormick since July 2004, when she hired him to file a worker's compensation claim against her then-employer, Exempla Healthcare ("Exempla"). After filing that claim, Respondent brought a civil complaint on McCormick's behalf in Denver District Court on August 19, 2005.[5] In the civil action, McCormick asserted ten tort claims (bad faith breach of insurance contract, civil conspiracy, and outrageous conduct) against Exempla and several other defendants, including Thomas, Pollart, Miller & Wetmore, LLC ("TPMW") and Brad Miller ("Miller"), the firm and the attorney who defended against her worker's compensation claim.[6]

---

1. Respondent originally was represented by Philip A. Cherner. Through a substitution of counsel filed on July 23, 2012, Mr. Cohen took Mr. Cherner's place as counsel for Respondent.

2. The PDJ admitted exhibits 5, 13–14, and A for limited purposes. Respondent stipulated to admission of exhibit 5 to show "what happened," but not for its truth. Exhibit 13 was admitted to show a position taken in litigation, while exhibit A was admitted to show the validity of Respondent's concern regarding a non-disparagement clause. The PDJ's admission of exhibit 14 is discussed in footnote 47.

3. Respondent's registered business address is 303 East 17th Avenue, Suite 1080, Denver, Colorado 80203.

4. See C.R.C.P. 251.1(b).

5. That case was captioned McCormick v. Exempla Healthcare, et al., case number 05CV6518.

6. Stipulation of Facts ¶ 4; Exs. 1–2. The other defendants, all of whom were involved in the evaluation of the worker's compensation claim, were Dr. William Woo and Michelle Horning, employees of Exempla, and Sedgwick CMS, a third-party claims administrator. Ex. 13 at 7.

In late 2005, the defendants moved to dismiss the entire civil action for failure to state a claim under C.R.C.P. 12(b)(5).[7] On March 22, 2006, Judge R. Michael Mullins dismissed nine of McCormick's ten claims, leaving one remaining bad faith count against Exempla.[8] Respondent filed a notice of appeal contesting the dismissal of the nine tort claims.[9]

A motions hearing concerning attorney's fees was then scheduled for February 7, 2008.[10] Carmen Decker ("Decker") was present for TPMW, as was Peter Forbes ("Forbes") for Miller and Troy Rackham for Exempla.[11] Just before the hearing commenced, Respondent and opposing counsel discussed a possible settlement.[12] After the hearing began and the lawyers entered their appearances, Judge Mullins permitted the parties to take a recess to continue their discussion.[13]

The lawyers engaged in further negotiations and then reconvened in the courtroom to present a settlement to the court. As Decker explained to Judge Mullins, McCormick agreed to discharge against all of the defendants "all claims that were brought in the District Court case that could have been brought and any claims arising out of any facts up to today's date," in exchange for the defendants waiving their right to attorney's fees and costs.[14] During a colloquy with Judge Mullins, Respondent and defense counsel stated that the settlement did not affect McCormick's right to proceed with her worker's compensation claim.[15]

Judge Mullins asked whether the parties wanted to move to dismiss immediately or after reducing the agreement to writing, and Forbes responded that the statements made on the record would suffice.[16] Judge Mullins indicated he would dismiss the case with prejudice and memorialize the dismissal in a minute order.[17] He asked if there were any "additional matters to be resolved that ha[d] not been placed on the record" and whether the record contained "the complete agreement of the material terms of this settlement."[18] Decker responded, "We anticipate a mutual release."[19]

Judge Mullins then asked McCormick whether she understood that the settlement agreement "ends the case."[20] McCormick affirmed that she understood the agreement and consented to it, and she said she had no questions.[21] Just before concluding the hearing, Judge Mullins told the parties, "If you all [have] any problems with the . . . ," and then appeared to think better of inviting the parties to return to court with any outstanding issues, saying, "well, I'll just leave that alone."[22] At the disciplinary hearing, Respondent and Forbes both testified that at the conclusion of the February 7 hearing, they believed the agreement was "done."

Eight days later, on February 15, 2008, Decker sent Respondent a "Mutual Settlement Agreement and Release of All Claims" ("Release").[23] The Release comprised nearly seven single-spaced pages of text, not including signature pages. It contained eight recitals, including the statement that McCor-

---

**7.** Stipulation of Facts ¶ 5.

**8.** Exs. 1–2; Stipulation of Facts ¶¶ 6, 8.

**9.** Ex. 5 at 507.

**10.** Defendants TPMW and Miller had requested approximately $23,000.00 in attorney's fees under C.R.S. section 13–17–201, which entitles defendants to reasonable attorney's fees when tort cases involving injury are dismissed pursuant to C.R.C.P. 12(b).

**11.** Ex. 3 at 524–25.

**12.** Ex. 3 at 524.

**13.** Ex. 3 at 524.

**14.** Ex. 3 at 525.

**15.** Ex. 3 at 526–27.

**16.** Ex. 3 at 527–28.

**17.** Ex. 3 at 529.

**18.** Ex. 3 at 529–30.

**19.** Ex. 3 at 530.

**20.** Ex. 3 at 530.

**21.** Ex. 3 at 530–31.

**22.** Ex. 3 at 531.

**23.** Ex. 5 at 506–14.

mick's worker's compensation claim was "still pending and [was] in no way affected by the resolution of the claims covered by [the Release]" and the representation that the district court had ruled the nine dismissed tort claims to be "groundless, frivolous or filed without substantial justification." [24]

The second section of the Release set forth nine "operative provisions," including the requirements that McCormick release "any and all past, present or future claims" against the defendants and that she indemnify and hold the defendants harmless from liability.[25] Also included was a "non-disparagement" clause, which provided that McCormick "shall not engage in any publicity regarding the matters that are the subject of this Agreement and shall not make any statements or criticize, disparage, slander, libel, defame, or otherwise, in any manner, directly or indirectly impugn, damage or take any action that could adversely affect the reputation of Defendants." [26]

Like the non-disparagement clause, other provisions of the Release were broadly worded, such as the following: "If it ever becomes necessary to do so, this document shall be construed or interpreted in its broadest and most complete sense in order to accomplish a complete termination of all controversies, claims, or defenses heretofore existing between or among the Parties." [27] Further, McCormick was to "forever end any claim she [might] have" against the defendants and "never, ever, sue" them, and the purpose of Release was to "forever terminate any and all claims, demands, suits and actions of any type and for Defendants to forever find their peace from her claims." [28] In addition, a provision entitled "Entire Agreement" indicates that the Release "embodies the entire agreement among the Parties [and] supersedes all prior agreements and understand-

ings, if any, whether oral or written, express or implied, relating to the subject matter hereof...." [29]

Respondent testified at the disciplinary hearing that the Release bore little resemblance to his expectations. Based upon his experience in worker's compensation cases, he anticipated that any release would be "a paragraph or two" and would not include a non-disparagement clause. Forbes also testified that he had expected the release would be only one to five paragraphs long.

Since Respondent viewed McCormick's matter as "the most contentious case he ha[d] ever handled in any arena," he resolved to examine the Release with a "fine-toothed comb." Upon review, Respondent grew concerned that the defendants could assert the non-disparagement clause limited McCormick's arguments in her worker's compensation case. Even though the parties stated during the February 7 hearing that the settlement agreement would not affect that case and the Release contained a recital to that effect, the Release also represented that it superseded all prior agreements of the parties as to the same subject matter.[30] As such, Respondent believed the defendants might argue that the non-disparagement clause barred McCormick from asserting in the worker's compensation case that her treating physician, an employee of Exempla, had a conflict of interest.

Respondent presented the Release and his concerns to McCormick. McCormick said that the Release contained terms to which she had not agreed, and they checked the transcript of the February 7 hearing to be sure. According to Respondent, she instructed him "in no uncertain terms" that there was no settlement and that he was to "proceed and fight as long as he could." [31] Decker, meanwhile, sent Respondent two fol-

24. Ex. 5 at 506–07.

25. Ex. 5 at 508, 510.

26. Ex. 5 at 511–12.

27. Ex. 5 at 510.

28. Ex. 5 at 511.

29. Ex. 5 at 511.

30. Ex. 5 at 506, 511.

31. McCormick did not testify at the disciplinary hearing. Given that the People have the burden of proof and that Respondent's characterization of McCormick's directions bears no indicia of unreliability, the Hearing Board accepts his characterization.

low-up letters, indicating that she was hoping to get the matter "wrapped up." [32] Although Respondent "did not like the situation," he sent the defense lawyers a fax on March 24, 2008, stating that McCormick would not sign the Release. [33] Respondent wrote that McCormick intended to claim duress and that his research revealed the district court lacked jurisdiction to dismiss the appeal. [34] He indicated that he planned the next day to file the brief in McCormick's appeal of the nine dismissed tort claims—as he in fact did—and invited defense counsel to contact him with any questions thereafter. [35]

Two days later, the defendants responded by filing a joint motion asking Judge Mullins to "enforce the settlement entered into by the parties at the February 7 hearing and placed on the record at that time," to order McCormick to file a notice of dismissal of her appeal, and to impose sanctions. [36] The defendants attached to their motion copies of the Release, Decker's follow-up letters, and Respondent's fax. [37] Respondent objected to the motion and requested a hearing, [38] but Judge Mullins granted the motion with a stamp on May 22, 2008. [39]

Respondent appealed that order on July 7, 2008. [40] In his opening brief, he argues first that there was no meeting of the minds between the parties and thus there was no settlement. [41] In essence, he claims that the Release contains terms not stated on the record during the hearing—including dismissal of the appeal, "a broad construction clause that would have dismissed all claims against Exempla," a non-disparagement clause, and a warranty of capacity to execute agreement. [42] Second, Respondent asserts that the district court lacked jurisdiction to dismiss the appeal and that a court cannot compel a party to do something she did not agree to do. [43] Next, Respondent raises an equal protection argument, contending that a settlement must be written and signed to be enforceable under the statute governing third-party mediation, and that there is no rational basis for treating non-mediated settlement negotiations differently from mediated negotiations. [44] Respondent's fourth argument is that the defendants should be estopped from claiming a settlement occurred, in light of Decker's letters requesting that McCormick sign the Release to "wrap up" the matter. [45] Finally, Respondent advances the alternative argument that McCormick agreed to the settlement under duress. He characterizes her as an elderly woman who was terminated from her job after filing her lawsuit and was "backed against a wall" by threats of attorney's fees. [46]

The court of appeals found that Respondent's arguments lacked merit. [47] It held

32. Ex. 5 at 505, 515.

33. Ex. 5 at 518.

34. Ex. 5 at 518.

35. Ex. 5 at 518.

36. Ex. 5 at 1–3.

37. Once a transcript of the February 7 hearing became available, Decker filed it with the court. Ex. 5 at 519.

38. Ex. 4.

39. Ex. 5. At the disciplinary hearing, Respondent testified that he believed it was unclear whether Judge Mullins's stamped approval encompassed the attached Release, while defense counsel argued that their motion only requested enforcement of the agreement placed on the record at the February 7 hearing, not enforcement of the Release.

40. The appeal was captioned *May B. McCormick v. Exempla Healthcare, et al.*, 08CA1409.

41. Ex. 6 at 566–67.

42. Ex. 6 at 567.

43. Ex. 6 at 567–69.

44. Ex. 6 at 569–71.

45. Ex. 6 at 571–72.

46. Ex. 6 at 573–75.

47. The PDJ admitted the court of appeals' opinion as exhibit 14 at the disciplinary hearing over Respondent's objection. Respondent argued that the People may not use that opinion to bolster their claim because the clear and convincing standard of proof in a disciplinary case is higher than in a civil appeal. Respondent urged the PDJ to rule the opinion inadmissible, citing *Colorado Dog Fanciers, Inc. v. City & County of Den-*

that the agreement reached at the February 7 hearing was binding because it was not contingent upon the mutual release.[48] While agreeing with Respondent that trial courts lack jurisdiction to dismiss appeals, the court of appeals held that Judge Mullins was not precluded from enforcing the agreement, even though the court of appeals had jurisdiction over the appeal itself.[49] The decision further characterized Respondent's equal protection argument as baseless and held that Decker's correspondence regarding "wrapping up" the matter did not form a reasonable basis for an estoppel claim.[50] Finally, the court of appeals concluded that the "tough choices" McCormick may have faced did not amount to duress.[51]

The court of appeals' opinion awarded attorney's fees to the appellees, pointing to the "clarity of the record made in open court" as to the settlement of the case and concluding the appeal was frivolous.[52] On remand, the district court awarded approximately $60,000.00 in fees to the defendants. Respondent paid that award.

## Legal Analysis

Colo. RPC 3.1 provides, in relevant part: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."

The rule contemplates that a lawyer has dual duties: to use the legal process for the client's "fullest benefit" while refraining from abusive conduct.[53] As further gloss on the rule, a lawyer must account for "the law's ambiguities and potential for change," and legal action is not frivolous "even though the lawyer believes that the client's position ultimately will not prevail."[54] Or, in the Colorado Supreme Court's words in a related context, "While the pursuit of losing arguments may not be a recipe for success, neither does it bear the hallmark of punishable or necessarily undesirable litigation conduct."[55]

It is now well-accepted that a lawyer's conduct is to be judged by an objective standard under Colo. RPC 3.1 and the synonymous Model Rule of Professional Conduct 3.1.[56] Yet courts in Colorado and other jurisdictions still struggle to distinguish frivolous litigation from meritorious litigation under this rule. On the one hand, unrestrained prosecution of lawyers for frivolous litigation would chill lawyers' zeal and ingenuity while allowing the state of the law to languish.[57] On the other hand, "lawyers are supposed to know the difference between 'nonfrivolous argument' and beating a horse that has recently been pronounced dead by a unanimous court."[58] One test used to distinguish such cases is to examine whether a lawyer "*persist[ed]* in the error."[59]

A lawyer's other professional duties add a layer of complexity to the analysis of

---

*ver*, 820 P.2d 644, 649 (Colo.1991), and *Attorney Grievance Commission of Maryland v. Bear*, 362 Md. 123, 763 A.2d 175, 181 (2000). The PDJ reads the case law not as precluding admission of prior adjudications made subject to a lower standard of proof but rather indicating that such adjudications merit limited weight. *See People v. Fitzgibbons*, 909 P.2d 1098, 1104 (Colo.1996) ("The conclusions of the district court and the court of appeals ... are certainly evidence that the respondent's claims were 'frivolous and groundless.'"). Accordingly, the PDJ instructed the Hearing Board to review the court of appeals' opinion in light of the applicable standards of proof.

**48.** Ex. 14 at 6.

**49.** Ex. 14 at 9–10.

**50.** Ex. 14 at 11–12.

**51.** Ex. 14 at 12–13.

**52.** Ex. 14 at 14.

**53.** Colo. RPC 3.1 cmt. 1.

**54.** Colo. RPC 3.1 cmts. 1–2.

**55.** *In re Foster*, 253 P.3d 1244, 1256 (Colo.2011).

**56.** *See* 2 Geoffrey C. Hazard Jr., W. William Hodes & Peter R. Jarvis, *The Law of Lawyering* § 27.12 (3d ed. Supp. 2012). However, an attorney's state of mind is not completely irrelevant. *See id.*

**57.** *See id.*

**58.** *See id.*

**59.** *See id.*

Colo. RPC 3.1 claims. One such duty is to provide competent representation to a client and to anticipate reasonably foreseeable risks to the client's interests.[60] In addition, a lawyer's obligations under Colo. RPC 3.1 may bump up against the lawyer's concurrent obligation under Colo. RPC 1.2(a) to "abide by a client's decisions concerning the objectives of representation," including the "decision whether to settle a matter." In such cases, Colo. RPC 3.1 trumps Colo. RPC 1.2(a). When a client seeks a lawyer's assistance in pursuing a frivolous claim, the lawyer must advise the client that the claim is baseless.[61] If the client nonetheless insists on proceeding, Colo. RPC 1.16(a) requires the lawyer to withdraw from the representation rather than violate the rules of professional conduct by prosecuting a non-meritorious claim.[62]

In assessing Respondent's conduct, this Hearing Board is not bound by the court of appeals' ruling that Respondent filed a frivolous appeal. To be sure, the court of appeals' opinion can be considered as evidence in this matter, but the Hearing Board also must recognize that a higher standard of proof—clear and convincing evidence—applies in this proceeding.[63] Moreover, the

Hearing Board heard evidence that was not presented to the court of appeals, in particular, defense counsel's testimony and Respondent's testimony as to his own perceptions and to his client's views. We also must be mindful of how the goals and standards for sanctioning frivolous litigation differ in the disciplinary setting. Here, the "paramount concern ... is the protection of the public and not punishment of the errant lawyer." [64] Indeed, disciplinary authorities have seldom seen fit to rebuke lawyers who already have been sanctioned under Rule 11.[65] Punishment for frivolous litigation has instead been left to the presiding tribunals in all but the most egregious cases.[66]

In the case at hand, Respondent's client informed him upon reviewing the Release that she did not agree to the settlement. As Colo. RPC 1.2 pointedly emphasizes, the decision whether to settle a claim is reserved to the client and is a decision to which the lawyer must defer. Respondent was faced with an ambiguous situation where it appeared to him and his client that some of the material terms of the agreement stated on the record had been unilaterally modified by opposing counsel in the Release. McCormick instructed him not to proceed "under

---

**60.** Colo. RPC 1.1; *First Interstate Bank of Denver, N.A. v. Berenbaum*, 872 P.2d 1297, 1300 (Colo.App.1993).

**61.** ABA/BNA *Lawyers' Manual on Professional Conduct* § 61:112 (2012) (citation omitted).

**62.** *See also id.* at § 61:112.

**63.** *See In re Egbune*, 971 P.2d 1065, 1067 (Colo. 1999) (noting that a trial court's ruling did not bind a hearing board because proof in civil actions typically is by a preponderance of the evidence, while in disciplinary proceedings proof is by clear and convincing evidence) (citing C.R.S. § 13–25–127); *Attorney Grievance Commission of Maryland v. Brown*, 353 Md. 271, 725 A.2d 1069, 1074–75 (1999) ("Although sanctions by other tribunals may constitute part of the findings supporting a conclusion that MRPC 3.1 has been violated, such sanctions cannot, standing alone without other findings, sufficiently prove such a violation occurred.").

**64.** *People v. Richardson*, 820 P.2d 1120, 1121 (Colo.1991); *see also In re Attorney C*, 47 P.3d 1167, 1174 (Colo.2002) (noting that revisions to Colorado's grievance system were intended to emphasize prevention, rather than punishment).

**65.** *See* Peter A. Joy, *The Relationship Between Civil Rule 11 and Lawyer Discipline: An Empirical Analysis Suggesting Institutional Choices in the Regulation of Lawyers*, 37 Loy. L.A. L.Rev. 765, 806–07 (Winter 2004) (pointing to the "negligible correlation between [F.R.C.P.] 11 sanctions and reported lawyer discipline for that same conduct").

**66.** *See id.* at 815; Ted Schneyer, *A Tale of Four Systems: Reflections on How Law Influences the "Ethical Infrastructure" of Law Firms*, 39 S. Tex. L.Rev. 245, 255–56 (Mar. 1998) (finding that disciplinary authorities typically leave to the courts sanctions for frivolous litigation, and opining that presiding tribunals "have obvious advantages over disciplinary agencies—expertise in evaluating pleadings and motions, a strong interest in protecting the integrity of proceedings in their own courtrooms, and power to dispose of the issue without initiating an entirely new proceeding"). *Cf. In re Attorney C*, 47 P.3d at 1174 (observing that Colorado has "an adjudicative system in place that deals regularly with discovery issues, and also an attorney grievance system that is ill-suited to addressing any but the most serious discovery violations").

any circumstances" with the settlement because she feared the impact it would have on her pending worker's compensation case.

Perhaps the more prudent approach for Respondent would have been to seek guidance from the court. However, Respondent did file a response to the defendants' motion to enforce the settlement, in which he explained the ambiguity of the situation and requested a hearing. The court issued an order enforcing the settlement without holding a hearing and did not specifically address the issues raised in Respondent's response. Thus, Respondent faced the difficult decision of whether to file the appeal. It should be noted that had he failed to file the appeal against McCormick's instructions, he might similarly have faced a complaint from her.

Once McCormick asked him to file the appeal, it was Respondent's duty to assess whether there was a plausible basis in law and fact to support his client's position. If he could make such an argument, he was obligated to follow his client's wishes unless he viewed such action as "repugnant" or he could invoke another basis for permissive withdrawal under Colo. RPC 1.16(b). If, by contrast, he could not advance McCormick's argument without running afoul of Colo. RPC 3.1, he was obligated under Colo. RPC 1.16(a) to withdraw from the representation.[67]

■■■■ The Hearing Board turns to legal principles governing the enforceability of settlement agreements to determine whether Respondent had a colorable basis for his actions. Courts interpret and enforce settlement agreements in accord with principles of contract law and with the policy favoring dispute resolution.[68] Where parties arrive at a settlement agreement yet intend to subsequently execute a document memorializing the terms, courts will hold parties to their agreement.[69] If, by contrast, parties merely reach a tentative settlement that lacks sufficiently definite terms or is contingent upon a later signed writing, the agreement lacks force.[70] "While parties may definitely agree on some issues, the absence of agreement on other material issues prevents the formation of a binding contract."[71] Courts determine what the essential terms of a contract are by reference to the parties' intentions, which are in turn evidenced by the surrounding circumstances.[72] Parties to a settlement agreement

**67.** It was suggested during the disciplinary hearing that Respondent was obligated to withdraw from the representation because his duty of candor compelled him to do so or because he had personally assented to the agreement at the February 7 hearing. But Respondent himself was not a party to the agreement and therefore could not have offered personal assent. Nor can the Hearing Board see how the duty of candor is relevant here.

**68.** *See Yaekle v. Andrews,* 195 P.3d 1101, 1107 (Colo.2008); *Yaekle v. Andrews,* 169 P.3d 196, 200 (Colo.App.2007) *aff'd on other grounds, Yaekle,* 195 P.3d 1101.

**69.** *See I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 713 P.2d 882, 888 (Colo.1986) ("The mere intention to reduce an oral or informal agreement to writing, or to a more formal writing, is not of itself sufficient to show that the parties intended that until such formal writing was executed the parol or informal contract should be without binding force.") (quotation omitted).

**70.** *Stice v. Peterson,* 144 Colo. 219, 224, 355 P.2d 948, 952 (1960) (holding that contractual terms must be sufficiently definite to enable a court to determine whether the contract has been performed); *DiFrancesco v. Particle Interconnect Corp.,* 39 P.3d 1243, 1248 (Colo.App.2001)

("there can be no binding contract if it appears that further negotiations are required to work out important and essential terms"); *see also Golding v. Floyd,* 261 Va. 190, 539 S.E.2d 735, 738 (2001) (holding that a handwritten "Settlement Agreement Memorandum" agreed to at a mediation was not a binding settlement agreement where the parties understood that a formal settlement agreement had to be drafted and signed).

**71.** *DiFrancesco,* 39 P.3d at 1248 (citing *Am. Mining Co. v. Himrod–Kimball Mines Co.,* 124 Colo. 186, 235 P.2d 804 (1951)); *see also Greater Serv. Homebuilders' Inv. Ass'n v. Albright,* 88 Colo. 146, 153–54, 293 P. 345, 348 (1930) ("If essentials are unsettled, and no method of settlement is agreed upon, there is no contract."); *Shoels v. Klebold,* 375 F.3d 1054, 1067 (10th Cir.2004) (applying Colorado law and stating: "When the language of a contract contains a latent ambiguity and one of the parties is in fact assenting to something different from what the other party agrees to, the upshot of that 'mistake' is that there was never a meeting of the minds as to a material term of the contract, and consequently there was never any contract at all.").

**72.** *Am. Mining Co.,* 124 Colo. at 190, 235 P.2d at 807.

may not set it aside if the terms later strike them as unsatisfactory.[73]

Under these principles, agreements to settle that include consent to execute mutual releases often are enforceable. But exceptions abound. For instance, in a Florida case, *Gaines v. Nortrust Realty Management*, a lessor and lessee of an office suite disagreed about the rate the lessee was to pay when exercising an option to extend the lease term.[74] During a trial recess, the parties reached an agreement as to the rental amount due in current and future lease terms and they also agreed to exchange "releases."[75] Thereafter, the lessor insisted upon an exchange of "general releases," while the lessee agreed only to sign a release with respect to the specific dispute at hand, so the lessor moved to enforce the alleged settlement agreement.[76] The court of appeals ruled that the trial court had erred in granting the lessor's motion, finding there was no meeting of the minds as to the scope of the releases—an essential element of the parties' alleged agreement.[77]

The Seventh Circuit reached a similar decision in *United States v. Orr Construction Co.*, a case involving a subcontractor's suit against a contractor to recover unpaid sums of money.[78] The parties entered into a written agreement establishing the payment due and stating that the "proper legal releases from all parties" would be exchanged by a certain date.[79] When the parties had difficulty negotiating those releases, the subcontractor moved to enforce the settlement agreement.[80] The trial court ruled the agreement enforceable, but the Seventh Circuit reversed, applying federal law.[81] While it found the parties intended to be bound, the Seventh Circuit concluded that the agreement concerning the releases could not be enforced because "[t]he phrase 'proper legal releases' could have any number of meanings depending on the view of the person interpreting it," and the parties' conduct after reaching the initial agreement did not support an inference that they had in fact reached a meeting of the minds.[82] Because the court could not "attach a definite meaning" to the original agreement, the court ruled it unenforceable.[83]

Under slightly different factual patterns, however, courts have ruled settlement agreements enforceable despite outstanding feuds regarding the nature of releases. For example, the Seventh Circuit distinguished *Orr* in the subsequent *Wilson v. Wilson* decision, which concerned a motion to enforce a settlement of litigation involving fiduciary duties.[84] In that case, the parties agreed in open court that the plaintiff would receive $1.2 million and would be barred from suing the defendants, though the parties did not specifically agree whether that objective would be achieved by means of mutual releases or mutual covenants not to sue.[85] Although the district court concluded that the parties had "nailed down an agreement," the parties continued to haggle over specifics.[86] A year later, the district court granted the plaintiff's motion to compel enforcement of the agreement, even though the defendants challenged its very existence.[87] The Seventh Circuit

73. *Royal v. Colo. State Pers. Bd.*, 690 P.2d 253, 255 (Colo.App.1984).

74. 422 So.2d 1037, 1038 (Fla.App.1982)

75. *Id.*

76. *Id.*

77. *Id.* at 1040. *But see Robbie v. City of Miami*, 469 So.2d 1384, 1386 (Fla.1985) (noting that in *Gaines*, there was no objective evidence of the terms of the agreement).

78. 560 F.2d 765, 767, 772 (7th Cir.1977).

79. *Id.* at 767.

80. *Id.* at 767–68.

81. *Id.* at 768.

82. *Id.* at 769–771.

83. *Id.* at 772; *see also Janky v. Batistatos*, 559 F.Supp.2d 923, 931 (N.D.Ind.2008) (holding that the term "mutual global release" was not sufficiently definite to be enforceable).

84. 46 F.3d 660, 665 (7th Cir.1995).

85. *Id.* at 662.

86. *Id.*

87. *Id.* at 663.

rejected the defendants' contention that the parties' failure to agree on the form of the releases rendered the agreement too indefinite to be enforceable, finding it sufficient under Illinois law that "there [could] be no doubt over what the parties in open court had agreed to do." [88]

In view of the legal authorities discussed above, the Hearing Board concludes that Respondent did not violate Colo. RPC 3.1 by advancing his client's position. Respondent had a colorable basis in both law and fact to argue that the parties had different understandings of the Release and that the Release was a material element of the agreement.

As we have explained, the Release as drafted was at odds with Respondent's expectations of a one- or two-paragraph mutual release. Forbes's testimony that he expected the Release to be just one to five paragraphs in length indicates that Respondent's assumptions did not simply reflect his own mistake.[89] Not only was the Release much longer than Respondent anticipated, but it had terms he did not foresee, including the non-disparagement clause, the "entire agreement" clause, and the inaccurate representation that McCormick's nine tort claims had been ruled frivolous.[90] As such, when confronted with the Release, Respondent had a colorable basis to question the scope and very existence of the agreement supposedly reached at the February 7 hearing.[91]

In addition to the argument that the Release differed from Respondent's understanding, Respondent also had several grounds to argue that it was a material element of the agreement. At the February 7 hearing, Decker stated that a mutual release remained to be drafted *immediately after* Judge Mullins asked whether the parties' statements comprised the material terms of the agreement.[92] And although defense counsel characterized the Release at the disciplinary hearing as a mere "detail" to "button up," Decker conceded that it was the product of nearly ten hours of her time, even though she had boilerplate language available to draw upon.

While Respondent might not have contemplated during the February 7 hearing that the "mutual release" to be exchanged was a material element of the agreement, he had a valid basis to view it as such upon review of the document. Several elements of the Release could have reasonably led Respondent to fear the defendants would seek to limit McCormick's worker's compensation claim. The non-disparagement clause contained language that precluded McCormick from making any statements or criticism that would "in any manner, directly or indirectly impugn [or] damage" the defendants.[93] Also disquieting to Respondent were the various instances of expansive language, such as the provision requiring the Release to be "interpreted in its broadest and most complete sense in order to accomplish a complete termination of all controversies, claims, or defenses heretofore existing between or among the Parties." [94]

Of course, those provisions were to be read in concert with the recitals, which included the statement that McCormick's worker's compensation claim was not to be affected by

88. *Id.* at 666–67.

89. *See Royal,* 690 P.2d at 255 ("A unilateral mistake or mistake of law, if any, is not a ground for setting aside an agreement."). *But see Shoels,* 375 F.3d at 1066–67 (applying Colorado law and stating that "[a]lthough one party's mistake about the facts relevant to an agreement is not normally grounds for rescission, the same is not true if the 'mistake' goes to a material term of the agreement itself.").

90. Judge Mullins's dismissal of McCormick's tort claims under C.R.C.P. 12(b)(5) did not equate to a determination that the claims were frivolous. *See Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 337 (2d Cir.1999) (stating that a judgment as a matter of law against a claim does not necessarily mean that the claim lacks any colorable basis).

91. Judge Mullins himself seemed to contemplate that some aspects of the settlement might remain unresolved when he mentioned the possibility of the parties having "problems" before apparently reversing course and saying he would "leave that alone." Ex. 3 at 531.

92. Ex. 3 at 530.

93. Ex. 5 at 511–12.

94. Ex. 5 at 510.

the Release. Principles of contract law instruct that recitals "should be reconciled with the operative clauses of the contract and given effect as far as possible." [95] In light of the recital indicating that McCormick's worker's compensation claim would not be affected, a court probably would not have construed the non-disparagement clause or any other operative provision of the Release to restrict McCormick's worker's compensation claim. Yet that recital arguably conflicted with another, which stated that the parties intended to "forever end . . . any and all claims" and that "[t]he desire to end any claim by the Parties against the other is paramount and is intended to end any relationship between Ms. McCormick and the Defendants no matter how created, envisioned, hypothecated, presumed, or alleged." [96] Moreover, there is case law holding that recitals in a contract are not binding upon the parties.[97] These legal authorities, coupled with Respondent's duty to anticipate reasonably foreseeable risks to his client, provided him with a reasonable basis for apprehension about future interpretation of the Release.

We also find some support for Respondent's concern that the defendants meant the Release to serve as the record of the agreement made at the February 7 hearing. After all, the title of the Release was expansive: "Mutual Settlement Agreement and Release of All Claims." Further, as noted above, the Release was meant to "embod[y] the entire agreement among the Parties [and] super-

sede[ ] all prior agreements and understandings. . . ." [98] Respondent testified that he was worried Judge Mullins's stamped approval of the defendants' motion to compel, to which the Release was attached, might have placed the court's imprimatur of approval upon the Release itself. Indeed, the defendants represented in their answer brief filed in the court of appeals that the Release "was intended to memorialize the parties' binding oral settlement agreement, per the representations made during the hearing by all counsel." [99]

The Hearing Board does not mean the foregoing analysis to suggest that the defendants or the court of appeals incorrectly interpreted the law. In fact, we believe the law favors the position that the parties reached a meeting of the minds at the February 7 hearing and that the material terms of the agreement were limited to the defendants' waiver of attorney's fees and McCormick's dismissal of all remaining claims save for her worker's compensation claim. But the standard of proof here is clear and convincing evidence, and our task is to determine whether Respondent had a colorable basis for filing McCormick's appeal. In light of his duty to exercise vigilance on his client's behalf, we believe he did.

In our view, the strongest arguments in Respondent's appeal brief were that the parties had not achieved a meeting of the minds and that the Release was a material term of the agreement.[100] The secondary arguments

---

95. *Stowers v. Cmty. Med. Ctr., Inc.*, 340 Mont. 116, 172 P.3d 1252, 1255 (2007); *see also* 17A C.J.S. *Contracts* § 403 ("although 'whereas' clauses do not control over the express provisions of a contract, they may be read in conjunction with the contract's operative portions to ascertain the parties' intention, where the operative clauses are ambiguous") (citations omitted).

96. Ex. 5 at 508.

97. *See, e.g., Int'l Trust Co. v. Palisade Light, Heat & Power Co.*, 60 Colo. 397, 401, 153 P. 1002, 1003 (1916) ("Recitals which are general, and not contractual, merely descriptive, are not binding."); *Dornemann v. Dornemann*, 48 Conn. Supp. 502, 850 A.2d 273, 281 (Conn.Super.Ct.2004) ("Recitals in a contract, such as 'whereas' clauses, are merely explanations of the circumstances surrounding the execution of the contract, and are not binding obligations unless

referred to in the operative provisions of the contract . . . .") (quotation omitted).

98. Ex. 5 at 511.

99. Ex. 13 at 11.

100. The assertion that McCormick did not understand she would have to dismiss her appeal is a less plausible argument, since courts determine whether parties' minds have met by reference to the parties' "objective manifestations," not "unexpressed subjective views" they may have held. *O'Brien v. Argo Partners, Inc.*, 736 F.Supp.2d 528, 534 (E.D.N.Y.2010) (quotations omitted). Nevertheless, McCormick was unsophisticated in legal affairs and the appeal was not mentioned on February 7. Although Respondent understood the appeal was encompassed in the agreement, it was McCormick—not Respon-

in the appeal were weaker, but we find they still pass muster under Colo. RPC 3.1. Although some of his assertions had comparatively little chance of success, Respondent supported them with references to the record, citations to germane case law in good standing, and succinct, logically structured argument.[101]

For instance, in arguing that Judge Mullins lacked jurisdiction to order dismissal of McCormick's appeal, Respondent cited several pertinent cases, including a Colorado Supreme Court decision.[102] The court of appeals explicitly agreed with Respondent that "[a] trial court does not have jurisdiction to dismiss an appeal." [103] Nevertheless, the court of appeals found that the district court merely "held" McCormick to her agreement, rather than actually dismissing the appeal.[104] In arriving at that decision, the court of appeals cited no authority contradicting Respondent's argument, nor did it explain the distinction between the district court requiring McCormick to dismiss her appeal and the district court itself dismissing the appeal. This suggests to the Hearing Board that Respondent's creative argument was colorable under Colo. RPC 3.1, even if common sense suggests Respondent's position should not prevail.

In summary, Respondent found himself in a difficult position: he believed an agreement had been reached, but his client did not share that view. He thus faced a potential conflict between his duties to the legal profession and the courts and his duty of loyalty to his client. Respondent chose to advance his client's arguments at significant risk to him-

self. Indeed, he paid approximately $60,000.00 as a consequence of agreeing to file McCormick's appeal. Although Respondent's arguments on appeal were unsuccessful, the Hearing Board concludes they had some basis in law and fact. We therefore find the People have not proved by clear and convincing evidence that Respondent violated Colo. RPC 3.1.

■ The People's allegation that Respondent engaged in conduct prejudicial to the administration of justice in violation of Colo. RPC 8.4(d) rests on a premise identical to their Colo. RPC 3.1 claim: that Respondent should not have appealed Judge Mullins's decision to enforce the settlement agreement and should not have advanced the claims contained in that appeal. Because the Hearing Board has determined that Respondent did not assert frivolous claims in the appeal, we also conclude that he did not violate Colo. RPC 8.4(d).

## IV. CONCLUSION AND ORDER

The Hearing Board determines the People have failed to demonstrate by clear and convincing evidence that Respondent engaged in any professional misconduct, and accordingly we **DISMISS** their complaint.

---

dent—who was the party to the agreement, and Respondent testified that she was unsure of the status of the appeal as of February 7. As such, it was not wholly frivolous for Respondent to contend the parties' minds did not meet as to the appeal.

**101.** *See Toledo Bar Ass'n v. Rust,* 124 Ohio St.3d 305, 921 N.E.2d 1056, 1063 (2010) (dismissing complaint against attorney whose "strategy may have been flawed" but who had "some arguably viable legal support for his actions").

**102.** *See* Ex. 6 at 568 (citing *People v. Dillon,* 655 P.2d 841, 844 (Colo.1982) (ruling that a trial court was divested of jurisdiction once a notice of appeal had been filed and therefore had no power to grant a motion for a new trial)).

**103.** Ex. 14 at 10.

**104.** Ex. 14 at 10.